Argued and submitted November 16, 2005, at Sweet Home High School, Sweet Home, reversed April 26, 2006

## STATE OF OREGON,
*Respondent,*

*v.*

## THOMAS W. MILBURN,
*Appellant.*

03-6220; A123203

134 P3d 969

John L. Susac, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

HASELTON, P. J.

Rosenblum, J., dissenting.

**HASELTON, P. J.**

Defendant, who was convicted of misdemeanor angling while revoked, ORS 497.441; ORS 496.992, appeals, assigning error to the trial court's denial of his motion for judgment of acquittal. Defendant contends that, by fishing on "free fishing weekend," ORS 497.079, he was not "engag[ing] in the activity for which [an angling] license * * * is required." ORS 497.441. We agree and, consequently, reverse.

The material facts are undisputed. Sometime in December 2002, defendant was fishing and was cited for keeping a "foul hooked" fish.[1] Accordingly, on January 2, 2003, defendant's "angling privileges" were revoked pursuant to ORS 497.415(6).[2] The revocation order prohibited defendant from holding or obtaining an angling license for 24 months. As such, defendant could not apply for another angling license until January 2, 2005.

In June 2003, Oregon State Police Trooper Craig Coggins received several complaints that defendant was planning to fish at Hebo Lake in Tillamook County over the weekend of June 7 and 8, which the Oregon Department of Fish and Wildlife had designated as a "free fishing weekend" pursuant to ORS 497.079[3] and OAR

---

[1] A "foul hooked" fish is one that has been hooked on some part of the body other than the mouth.

[2] Pertinent portions of ORS 497.415 are set out below. *See* 205 Or App at 211-12.

The facts relevant to defendant's original revocation are incomplete and difficult to piece together. It appears that, at the time defendant was originally cited for keeping the foul-hooked fish, he possessed a valid angling license. However, the resulting revocation order did not occur until January of the next year. Because defendant's angling license would have expired on December 31, 2002, *see* OAR 635-010-0165, the revocation was pursuant to ORS 497.415(6), which applies to persons who do not possess a license at the time of revocation.

At trial, defendant argued that a revocation pursuant to ORS 497.415(6) is a revocation of a privilege rather than a revocation of a license, and that therefore he is not a person who has had a "license" revoked. The trial court disagreed and ruled that the "angling while revoked" statute applies to revocations under ORS 497.415(6). Defendant does not challenge that ruling on appeal.

[3] ORS 497.079 provides:

"Notwithstanding ORS 497.075 * * * the State Fish and Wildlife Commission may issue an order that authorizes individuals to angle for fish * * * in the

635-011-0102.[4] Coggins set up surveillance at the lake, and, on June 7, he filmed defendant fishing with his grandniece.

The next day, Coggins and his partner confronted defendant at his campsite on the lake. They told defendant that they had evidence of him fishing in violation of his previous revocation. Defendant admitted to fishing on June 7; however, he explained to the officers that he had believed that he was allowed to fish that day because a license is not required on "free fishing weekend." Nevertheless, Coggins issued defendant a citation for misdemeanor angling while revoked. ORS 497.441. That statute, which we address in detail below, provides:

> "No person who has had a license, tag or permit revoked * * * shall engage in the activity for which the license, tag or permit is required:
>
> "* * * * *
>
> "(2) During the period for which the person is prohibited by law from applying for or obtaining another such license, tag or permit."

*See also* ORS 496.992 (providing that "violation of any provision of the wildlife laws * * * is a Class A misdemeanor when the offense is committed with a culpable mental state").

At defendant's trial, the state presented evidence establishing the facts just recounted. After the state completed its case-in-chief, defendant moved for a judgment of acquittal. Specifically, defendant argued, in part, that (1) ORS 497.441 prohibits a person who has had a license, tag, or permit revoked from engaging "in the activity for

---

waters of this state without the licenses * * * required by law, on any two consecutive days each year."

ORS 497.075 provides, in part:

"(1) Except as provided in subsections (2), (3) and (4) of this section, no person shall angle for, take, hunt or trap * * * any wildlife unless the person has in possession such valid licenses, tags and permits therefor as the State Fish and Wildlife Commission issues."

[4] OAR 635-011-0102 provides:

"The Saturday and Sunday immediately following the first Monday in the month of June shall be designated as an annual free fishing weekend. No angling licenses or tags shall be required for the taking of fish for personal use in Oregon waters on this weekend."

which the license, tag or permit is required"; (2) a license is not required to fish on "free fishing weekend"; and, consequently, (3) although defendant had, in fact, fished on June 7, that conduct was not a violation of the "angling while revoked" statute.

The court denied defendant's motion, concluding:

"[I]t looks to me like the only way that I can read those two statutes so that one of them doesn't eliminate the other one—which is something I'm required not to do when I do statutory interpretation—is to say that because 497.441 is not one of the exemptions listed in 497.079, there was no intention for the legislature to allow those people who were suspended or had their privileges revoked to fish on open fishing day. So that's my conclusion.

"It seems to me that that's the whole point of the game statute which is that those people who violate the law should not be allowed to engage in the activity."

The court subsequently convicted defendant.

On appeal, defendant reiterates his fundamental argument to the trial court, *viz.*, that the "activity" in which he engaged, fishing on "free fishing weekend," is not prohibited by ORS 497.441 because that is not an "activity for which [a] license * * * is required." The state responds that the pertinent, referent "activity" for purposes of ORS 497.441 is *any fishing* and that, because a license is required for *fishing*, and defendant's angling privileges had been previously revoked, his conduct violated ORS 497.441. Accordingly, like the trial court, we must resolve a discrete issue of statutory construction: What is the proper relationship between ORS 497.441 and the "free fishing weekend" statute, ORS 497.079?

We begin with ORS 497.441. We do so not only because ORS 497.441 was the basis of defendant's conviction, but also because, given that ORS 497.079 was enacted eight years after ORS 497.441, Or Laws 1981, ch 86, § 2; Or Laws 1989, ch 344, § 2, the former can serve as context for the latter, but not vice versa. *See, e.g., State v. Ford*, 188 Or App 424, 428 n 3, 72 P3d 93 (2003).

As noted, ORS 497.441 prohibits a person who has had a license, tag, or permit revoked from engaging in "the

activity for which the license, tag or permit is required[.]" In determining the scope and content of that critical phrase, we first consider the text of the statute in context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). If, after we engage in that inquiry, the statute remains ambiguous, we look to the statute's legislative history and, finally, to certain "third-level" maxims of statutory construction. *Id.* The object of our inquiry is, of course, to discern and enforce the legislature's intent. *Id.*

The plain text of ORS 497.441 invites question begging: Depending on the generality or particularity of the characterization of defendant's conduct ("fishing" as opposed to "fishing on a 'free fishing weekend' "), defendant either did, or did not, "engage in the activity" for which an angling license "is required." However, "first-level" contextual reference to two other, related statutes resolves that ostensible circularity in defendant's favor.

The first of those contextually pertinent statutes is the general licensing statute, ORS 497.075. That statute provides, in part:

"(1)   Except as provided in subsections (2), (3) and (4) of this section, no person shall angle for, take, hunt or trap, or assist another in angling for, taking, hunting or trapping, any wildlife unless the person has in possession such valid licenses, tags and permits therefor as the State Fish and Wildlife Commission issues.

"(2)   An angling or shellfish license is not required:

"(a)   Of a person younger than 14 years of age. However, each such person who angles for salmon, steelhead trout, sturgeon or halibut must have in possession a valid annual tag to angle for salmon, steelhead trout, sturgeon and halibut while so angling.

"(b)   Of a resident person to angle or take shellfish on land owned by that person. However, each such person who angles for salmon, steelhead trout, sturgeon or halibut must have in possession a valid annual tag to angle for salmon, steelhead trout, sturgeon and halibut while so angling.

"(c)   Of a resident person to angle or take shellfish on land owned by a member of the person's immediate family

and upon which the person resides. However, each such person who angles for salmon, steelhead trout, sturgeon or halibut must have in possession a valid annual tag to angle for salmon, steelhead trout, sturgeon and halibut while so angling.

"(d)   Of a person to angle for or otherwise take smelt.

"(e)   Of a person to take crayfish or freshwater clams."[5]

Thus, the statutory scheme does not (and did not in 1981)[6] impose a licensing requirement for all types of angling, *i.e.*, for "angling" *generically*. Rather, the statutory scheme distinguishes among different angling activities, only some of which require a license. So understood, in context, the prohibition in ORS 497.441 against engaging in "the activity for which the license * * * is required" necessarily refers only to those angling activities that do, in fact, *require* a license—and not to any and all angling activities.

That understanding comports not only with the statute's plain language but also with practical common sense. For example, if the state were correct in its premise that ORS 497.441 applies to any angling activities while revoked, then, notwithstanding the express exemptions from licensing requirements in ORS 497.075(2), a person with a revoked license would not be entitled to fish for certain species on his or her own property—and, indeed, would be subject to enhanced criminal sanctions for doing so.

The second pertinent contextual statute, the license revocation statute, ORS 497.415, corroborates that the legislature did not intend such a broad construction of "activity for which [a] license * * * is required" in ORS 497.441. ORS 497.415 provides, in part:

"(1)   * * * [W]hen any person is convicted of a violation of law or any rule adopted pursuant thereto * * * as provided in subsection (2) of this section, the court may order

---

[5] Subsections (3) and (4) of ORS 497.075 create similar exemptions to the general prohibition against hunting or trapping without a license. For example, ORS 497.075(3)(b) and (4)(a) create exemptions for hunting and trapping certain species of animals on one's own property.

[6] The exemptions in ORS 497.075(2) were enacted in 1973. Or Laws 1973, ch 723, § 49.

the State Fish and Wildlife Commission to revoke such of the licenses, tags and permits issued to that person pursuant to the wildlife laws as the court considers appropriate. Revocation of licenses, tags and permits is in addition to and not in lieu of other penalties provided by law.

"(2) The license, tag and permit revocation provisions of subsection (1) of this section apply to the following persons:

"(a) Any person who is convicted of a violation of the wildlife laws, or any rule adopted pursuant thereto * * *.

"* * * * *

"(6) If a person convicted of conduct described in subsection (2) of this section does not possess at the time of conviction those licenses, tags and permits issued pursuant to the wildlife laws that the court would have revoked pursuant to this section, the court shall specify by order those licenses, tags and permits that would have been revoked and shall forward a copy of the order to the commission. No person who is the subject of such a court order shall apply for, possess or obtain another such license, tag or permit for the period of 24 months from the date of the order."

Nothing in the text of ORS 497.415 suggests that, in addition to revocation of the ability to engage in angling, hunting, or trapping activities that require a license, tag, or permit, revocation also prohibits the person from engaging in fish or game activities that *do not* require a license, permit, or tag. To be sure, ORS 497.415(1) states that "[r]evocation of licenses, tags and permits is in addition to and not in lieu of other penalties provided by law." But the fundamental point remains: Nothing in ORS 497.415 (where the consequences of revocation most logically would be identified), ORS 497.441, or any other statute explicitly purports to deprive a person, upon revocation, of the ability to engage in activities that are *exempt* from licensing requirements.

We thus conclude, at *PGE*'s first level, that the term "activity for which [a] license * * * is required" in ORS 497.441 means exactly what it says: A person whose angling license has been revoked violates that statute only if he or she engages in an angling activity that requires a license.

Conversely, there is no violation if the person engages in an angling activity that does not require a license.[7]

We note, parenthetically, that nothing in the legislative history of ORS 497.441 contradicts that understanding. That legislative history shows that the legislature intended to differentiate between the circumstance in which (a) a person engages in fish or game activities without first obtaining the required license; and (b) a person engages in fish or game activities requiring a license after his or her license has been revoked and while the revocation is still in effect. The legislature, in enacting ORS 497.441, intended to impose enhanced sanctions for the latter—and, in its view, more culpable—conduct. For example, the Senate Agriculture and Natural Resources Committee's "Staff Measure Analysis" of 1981 Senate Bill 763 included the following description:

> "Problem addressed. There is no current prohibition against hunting or fishing while revoked. An individual who is revoked under the provisions of the wildlife laws can only be cited for angling or hunting without a license.
>
> "* * * * *
>
> "Major issues discussed. Witnesses relayed their concern that hunting or fishing while revoked is a serious offense and deserves statutory restriction.
>
> "Witnesses said that hunting or angling while revoked is a more serious offense than hunting or fishing without a license because the violator is on notice of violation and actively disregards the revocation."

See also Tape Recording, Senate Committee on Agriculture and Natural Resources, SB 763, Mar 27, 1981, Tape 21, Side A (testimony of Rollie Rousseau, Oregon Department of Fish and Wildlife).

Thus, it is apparent that the legislature, in enacting ORS 497.441, did intend to impose enhanced sanctions on

---

[7] The dissent contends that there is a plausible ambiguity at *PGE*'s first-level and then proceeds to resolve the case by resort to third-level maxims of statutory construction. For the reasons just given—and, particularly, the contextual interplay with ORS 497.075 and ORS 497.415 (neither of which the dissent addresses as contemporaneous context for construing ORS 497.441)—we disagree.

those who engage in prohibited activities after their licenses have been revoked. But there is absolutely no indication that the legislature intended to preclude persons, during a period of revocation, from engaging in activities that do *not* require a license—and to punish them if they do engage in such activities.

We proceed, then, to the "free fishing weekend" statute, ORS 497.079. That statute provides, in part:

"Notwithstanding ORS 497.075, 497.121 and 497.132, the State Fish and Wildlife Commission may issue an order that *authorizes individuals to angle for fish * * ** in the waters of this state *without the licenses * * * required* by law, on any two consecutive days each year."

(Emphasis added.) *See also* OAR 635-011-0102 (designating the Saturday and Sunday immediately following the first Monday in June as the annual "free fishing weekend" and providing that "[n]o angling licenses or tags shall be required for the taking of fish for personal use in Oregon waters on this weekend"). ORS 497.075, ORS 497.415, and ORS 497.441 serve as context for ORS 497.079.

Nothing in the text of ORS 497.079 or in the statutory context suggests that the legislature intended to exclude persons whose angling licenses had been revoked from participating in "free fishing weekend." Rather, the statute begins with a broad "notwithstanding" clause that explicitly emphasizes that angling on "free fishing weekend" is not subject to the general licensing statute, ORS 497.075, or to the statutes (ORS 497.121 and ORS 497.132) pertaining to licensing fees. Further, the language used to create the exemption for "free fishing weekend" is almost identical to the language in ORS 497.075(2) creating the exemption for angling on one's own property or angling for certain species. *Compare* ORS 497.075(2) (stating that for certain specified angling activities, "[a]n angling or shellfish license is not required"), *with* OAR 635-011-0102 (stating that, on the designated days, "[n]o angling licenses or tags shall be required").

In sum, at the first level of the *PGE* analysis, ORS 497.079 is unambiguous. The exemption from licensing

requirements embodied in that statute is unqualified. ORS 497.079 applies to all Oregonians, including those whose angling licenses have been revoked.

Defendant, in fishing on "free fishing weekend," was engaging in an angling activity that was exempted from licensing requirements. Consequently, he was not engaging in an "activity" prohibited by, and punishable under, ORS 497.441. Accordingly, the trial court erred in denying defendant's motion for judgment of acquittal.

Reversed.

**ROSENBLUM, J.,** dissenting.

The majority concludes that ORS 497.441 is unambiguous and that revocation of an angling license does not apply to "free fishing weekend." I disagree. In my view, analyzing the statute under the first and second levels under *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), does not demonstrate clearly what the legislature intended—that is, whether the revocation of an angling license encompasses "free fishing weekend"—so it is necessary to reach the third level of analysis. One maxim of construction at that level allows this court to consider what the legislature would have done if it had had before it the issue presented in this case. I do not believe it would have decided to give an annual two-day reprieve to persons whose angling licenses were revoked for violations of the wildlife laws. Accordingly, I respectfully dissent.

In my view, there are two interpretations of ORS 497.441 that are at least as plausible as the one adopted by the majority, thereby rendering the statute ambiguous. First, as the state argues, the phrase "the activity for which the license, tag or permit is required" could be meant simply to distinguish among angling, hunting, and trapping. The fact that the statute refers to "*the* activity" suggests that there is a single activity to which each license, tag, or permit applies rather than a variety of activities. It seems reasonable to read ORS 497.441 to mean simply that, if a person's angling license is revoked, the person is barred from angling, but not from hunting or trapping.

There is a second plausible interpretation: that is, ORS 497.441 does not prohibit all angling activities during the revocation period, but does prohibit engaging in angling activities that *generally* require a license—even when the general requirement is temporarily suspended for "free fishing weekend." Certainly, at any time during the revocation period, other than "free fishing weekend," the conduct that defendant engaged in here—fishing at Hebo Lake—is included in "the activity" prohibited by ORS 497.441. It is entirely plausible to construe the statute to mean that those activities that generally require a license are prohibited at *all* times during the revocation period. Under that interpretation—which I find to be the most plausible—so long as it occurred during the revocation period, defendant's conduct is included in the prohibited "activity" within the meaning of ORS 497.441.

Because there is more than one plausible way to read ORS 497.441, it is necessary to proceed to the second level of *PGE* and examine the legislative history for clues to the legislature's intent. As the majority acknowledges, the legislative history of ORS 497.441 demonstrates that, when it enacted the statute, the legislature intended to impose enhanced sanctions on those who engage in prohibited activities after their licenses have been revoked. In other words, it intended to distinguish between persons who simply do not have licenses and those whose licenses have been revoked—and to deal more harshly with the latter. While perhaps not dispositive with respect to the precise issue before us, the legislative history indicates that the legislators were not feeling especially sympathetic toward persons whose licenses were revoked for violations of the wildlife laws. Nevertheless, because the legislative history is not dispositive, resort to the third level of *PGE*—maxims of statutory construction—is necessary.

One maxim instructs the court "to construe a statute in accordance with what it believes the legislature would have done, had that body specifically addressed the issue at hand."[1] *State v. Gulley*, 324 Or 57, 66, 921 P2d 396 (1996).

---

[1] Although I believe that the "what would the legislature have done" maxim should be relied on only as a matter of last resort, I have considered other

Given that the mood of the legislature was not favorable to persons whose licenses were revoked for violations of the wildlife laws, it seems clear what the answer would have been had the legislature considered whether such persons should be included in any future-enacted temporary suspensions of the general licensing requirement. About the *last* thing that the 1981 Legislative Assembly would have wanted would have been to reward revoked anglers with a weekend-long free pass.

The text and the legislative history of ORS 497.079 give further guidance.[2] They demonstrate that, in establishing a "free fishing weekend," the legislature's *only* purpose was to allow people who did not have licenses to go fishing without having to pay the usual fees. All other regulations pertaining to fishing would remain intact. Tellingly, the statute opens with a "notwithstanding" clause that refers to the general licensing statute, ORS 497.075, and to the statutes

---

third-level maxims—including the "principle of lenity" and the related principle that a defendant should be given "fair warning" that his conduct is criminal, ORS 161.025(1)(c)—and have found none that provides any relevant guidance in this case. The principle of lenity appears to have been overruled by statute. *See* ORS 161.025(2); *but see State v. Isom*, 313 Or 391, 396 n 4, 837 P2d 491 (1992). The "fair warning" principle does not apply in this case because the ambiguity in ORS 497.441 does not rise to the level of unconstitutional vagueness. *See State v. Duggan*, 290 Or 369, 373, 622 P2d 316 (1981) (statutes did not satisfy the "fair warning" requirement when they were "so ambiguous as to be unconstitutionally void for vagueness").

[2] As the majority notes, ORS 497.079 was enacted eight years after ORS 497.441 and thus cannot serve as context at the first level of a *PGE* analysis. However, prior decisions from this court and the Supreme Court indicate that, at the third level, in determining what the legislature would have done had it considered an issue, we are not limited to considering the context that existed at the time of enactment. *See, e.g., Marks v. McKenzie High School Fact-Finding Team*, 319 Or 451, 457-63, 878 P2d 417 (1994) (canvassing decisions of other jurisdictions with laws comparable to the Oregon statute at issue, including decisions rendered after Oregon's statute was enacted, and stating, "Because the lines of analysis in the foregoing cases became fully developed only after the Oregon law took effect, they are not expositions of the expressed intent of the Oregon legislature. Nevertheless, we find the analysis that emerges from those cases persuasive as to what the legislature would have intended, had it considered the specific issue."); *State v. Werdell*, 202 Or App 413, 423-24, 122 P3d 86 (2005), *rev allowed*, 340 Or 708 (2006) (considering a later-enacted statute to determine what the legislature would have done had it considered that the statute at issue was unclear); *State v. Perry*, 165 Or App 342, 996 P2d 995 (2000), *aff'd*, 336 Or 49, 77 P3d 313 (2003) (considering "the various amendments to ORS 166.250" and "the overall scheme of firearms regulation, as it has evolved," in determining what the legislature would have done had it considered the issue at hand when it originally enacted ORS 166.250).

governing licensing fees, ORS 497.121 and ORS 497.132, but it makes no mention of ORS 497.441, the revocation statute. Certainly, the legislature knew how to explicitly suspend application of otherwise applicable statutes, and it did not do so with the revocation statute. Also, when the legislature renewed the statute in 1995,[3] Rod Ingram, the Deputy Director of the Oregon Department of Fish and Wildlife, testified before the Senate Committee on Agriculture, Natural Resources, and Environment. The committee asked Ingram whether catch limits and other restrictions would still apply on "free fishing weekend." He stated, "Season restrictions, gear restrictions. The *only thing that is waived* is the fishing license fee, and the need for a salmon/steelhead tag or a halibut tag or a sturgeon tag." Tape Recording, Senate Committee on Agriculture, Natural Resources, and Environment, HB 2221, May 10, 1995, Tape 103, Side A (emphasis added); *see also* Staff Measure Summary, House Committee on Natural Resources, Agriculture and Forestry Subcommittee, HB 2221, Apr 21, 1995, ("[ORS 497.079 allows] the Fish and Wildlife Commission to authorize two consecutive days of angling for fish without payment of license or tag fees."). It seems clear from that discussion that, in enacting "free fishing weekend," the legislature intended merely to waive the fee for people who do not have licenses—not to grant a two-day amnesty for people who have violated the wildlife laws.

In short, had the legislature considered the issue before us, I believe it would have expressly prohibited angling on "free fishing weekend" for persons whose angling licenses were revoked for violations of the wildlife laws. For that reason, ORS 497.441 should be construed to mean that a revoked angler may not take advantage of "free fishing weekend" if it falls during the revocation period.

I respectfully dissent.

---

[3] ORS 497.079 was originally enacted in 1989, as noted, but it contained a sunset clause that provided that it would automatically be repealed in 1996. Thus, the 1995 Legislative Assembly revisited the statute before deciding whether to make it permanent.